DECISION
Plaintiff appeals the real market value of commercial property identified as Account 1098605 (subject property) for the 2009-10 tax year. A telephone trial was held on May 31, 2011. Orville Nix (Nix) appeared and testified on behalf of Plaintiff. David W. Sohm (Sohm), Registered Appraiser 3, Lane County Department of Assessment and Taxation, appeared and testified on behalf of Defendant. Plaintiff's Exhibit 1 and Defendant's Exhibit A were received without objection.
 I. STATEMENT OF FACTS
The subject property is "[a] 28.66 acre industrial site improved with a regional distribution warehouse containing 523,748[1]
square feet including 22,470 square feet of ground floor office and 11,520 square feet of mezzanine office." (Def's Ex A at 4.) Sohm testified that the highest and best use of the subject property is as a regional distribution warehouse. The subject property is located in Springfield, Oregon, within a few miles of Interstate 105 and Interstate 5. (Id.) Sohm testified that, at the time the subject property was built, the Springfield airport was across the street and not much else existed in the immediate area. He testified that the subject property is now surrounded by a mini-storage unit, a drainage channel, a WinCo *Page 2 
foods, and other retail outlets including WalMart; it is not a typical industrial location and that is not a benefit to Plaintiff. (See Def's Ex A at 6, 7 (aerial photos).) The warehouse "was constructed in 1974 with 30 foot concrete tilt-up walls on the warehouse and 12 foot walls on the office at the southwest corner of the building." (Id. at 8.) Sohm determined the effective age of the warehouse to be 1985. (Id.) The "clear height of the warehouse is approximately 28 feet and ranges from 27 to 32 feet * * *. Recently constructed warehouses of similar quality reflect wall height of 35 to 38 feet." (Id.) Sohm testified that newer warehouses include an early suppression fast response (ESFR) fire response system; newer systems, such as the ESFR, are much better at putting out fires quickly without damaging the contents of the warehouse. Sohm testified that it would cost $1.2 million to upgrade the subject property to an ESFR.
Nix testified concerning his opinion of changes in the market between 2001 and 2009, focusing especially on differences from 2007 to 2009. He testified that, from January 2002, to January 2007, market values rose, but by January 1, 2009, values had begun to decline. Nix testified that, on January 1, 2007, typical vacancy rates were around 5 percent, capitalization rates were about 8.5 percent, and rental rates were $3.85 per square foot. He testified that, as of January 1, 2009, typical vacancy rates were about 7.5 percent, capitalization rates were around 11.5 percent, and rental rates had fallen to $3.25 per square foot.
Nix testified that the subject property is under a sale and leaseback agreement for 20 years that was established in 2002, including two 10-year options. He testified that the money received from investors was more than what could have been received from the bank and that is why Plaintiff selected that arrangement. Nix testified that all rights to the subject property were transferred in that sale; the investors currently own subject property and Plaintiff is paying the investors back for money lent to Plaintiff. He testified that, as of January 1, 2009, three sale and *Page 3 
leaseback agreements were in existence, shared by three distribution warehouses, for total of $5,434,277.03. Nix testified that the subject property constitutes 37.31 percent of the total rent on an annual basis. Nix testified the share of annual rent for the subject property was $2,027,529, or $3.88 per square foot, in 2009; he noted that amount is what investors received in 2009. He testified that that lease rate is indicative of rate of the loan, not of market rents. Nix testified that he believes Defendant is analyzing the value of the sale and leaseback agreement rather than the fair market value of the subject property. He testified that, if market rents are considered rather than the terms of the agreement, the real market value would be $10,045,000.
Nix testified that two distribution warehouses on 25 acres of land in Oregon sold for a total of $13,100,000. Nix testified that both properties are located near Interstate 5. Nix testified that the capitalization rate was 9.5 percent. Nix testified concerning the sale of an Ace Hardware Distribution Warehouse in Yakima, Washington, a 501,270 square feet facility that was built in 1983. (See Ptf's Ex 1 at 10.) Nix testified that it sold for $8,150,000, or $16.26 per square foot, in March 2006, then sold again in April 2007 for $13,503,000, or $26.48 per square foot. (See id.) He testified that it is 100 percent occupied by a single tenant. Nix testified that he "knows" the sale was a sale and leaseback agreement, but cannot prove it; that is the only explanation for the $10 per square foot increase in one year.
Nix testified concerning several comparable sales that he identified. Nix reported a sale of property in Woodland, California on August 13, 2010, at $25.15 per square foot. Nix testified that the Woodland property and the subject property are similar with the following exceptions: the Woodland property was built in 1998, the Woodland property had an "ESFR system" — a "rapid fire suppression system" to "protect inventory" — that costs about $1.5 million to install (See Ptf's Ex 1 at 1); and the Woodland building features higher walls. Sohm testified that he *Page 4 
contacted the broker for the Woodland sale and received a very thorough package of information including market trend analysis. Sohm testified that the Woodland sale involved two warehouses that, taken together, are comparable to the subject property. He testified that the Woodland sale reflected a capitalization rate of about 9.4 percent, but that rate would be lower for the subject property. Sohm testified that the Woodland market area is depressed; the area is overbuilt and properties typically experience vacancy rates around 10.9 percent.
Nix testified that all of the sales that he found nation-wide were around $20 per square foot of less. For instance, he testified that a store in Texas sold for $18 per square foot, a store in New Hampshire sold for $21 per square foot, and another building in Texas sold recently for $17 per square foot. Nix testified that the value per square foot of subject property is higher than all of the comparable sales. He testified that a range of $16 per square foot to $22 per square foot is reasonable and he thinks $20 per square foot is appropriate for the subject property.
Nix testified that Plaintiff had the subject property appraised on June 28, 2001, by Mueller and Co. (Mueller) for the purpose of obtaining a bank loan; a value of $14.6 million was determined. He testified that he thinks all growth in the market subsequent to 2001 disappeared between 2007 and 2009 and values fell more than they rose; thus, the 2001 Mueller appraisal is supportive of Plaintiff's requested value. Sohm testified in response that the subject property was recently appraised again by Mueller. Sohm testified that Mueller used the following: $.25 per square foot for warehouse area and $.50 for office area to estimate income; a vacancy rate of five percent; a two percent allocation for management and a two percent allocation for reserves for capital replacement; and a 9.25 percent capitalization rate for a total indicated value of $16,945,000. Sohm testified that Plaintiff's requested value of $10.5 million is far too low, even based on the more recent Mueller appraisal. *Page 5 
Sohm testified that the subject property is a large distribution warehouse for the Eugene/Springfield area; the next largest warehouse in the area is 150,000 square feet. He stated that, as a consequence, there is not much local data to analyze; he obtained data for the state and region from the Oregon Department of Revenue and also from publications. Sohm testified that, based on his review of various publications, industrial properties and big distribution centers in the Midwest and South regions were more troubled than in the West Coast region.
Sohm considered all three approaches of valuation: the cost approach, the sales comparison approach, and the income approach. (Def's Ex A at 11.) He considered the cost approach to be unreliable as a result of the age of the building, but determined a land value for the subject property. (Id.) Sohm developed a sales comparison approach and an income approach using the direct capitalization method. (Id.) Sohm gave "primary credence" to the income approach because that is "the method used by buyers and sellers," but noted that the sales comparison approach value is supportive of the income approach value. (Id. at 19.)
A. Land value
Sohm identified four land sales in the Eugene/Springfield area, two of which occurred in 2006 and two of which occurred in 2008. (Def's Ex A at 12.) Based on those land sales, Sohm determined that a price of $2.50 per square foot is appropriate for the subject property, for a bare land value of $3,121,072. (Id.) Sohm determined a site developments value of $1,248.429 for the subject property, for a total "site value of $4,370,000" rounded. (Id. at 13.)
B. Sales comparison approach
Sohm testified that he looked outside of the immediate Eugene/Springfield market area because there are not many comparable properties in that area. He testified that he found sales in Wilsonville, Portland, Tacoma, and Sumner. He testified that his comparable sales all occurred *Page 6 
in 2007 because he could find no newer sales of large warehouse properties. Sohm testified that he recognizes that there are issues with time trending from 2007 to January 1, 2009, but does not consider those issues to be terribly significant because the financial problems of late 2008 were not reflected in the market as of January 1, 2009. Sohm testified that he tried to determine what land contributed to each sale in order to make an adjustment for location. He testified that he also made adjustments for age, wall height, and finished office area. Sohm testified that office area typically rents for more per square foot than warehouse area, noting that 6.4 percent of the subject property is office area. Sohm testified that his comparable Sale 1 is the most similar to the subject property in that respect, with 5.4 percent office space. (Id. at 14.) Sohm determined a range of adjusted prices of $38 to $46 per square foot. (Id. at 15.) Noting that the subject property is older, Sohm concluded a price of $38 per square foot for the subject property, for a value of $19,900,000, rounded, under the sales comparison approach. (Id.)
C. Income approach
Sohm testified that, again, he looked at properties outside of the Eugene/Springfield area for his income approach, identifying five rent comparables in Oregon. (See Def s Ex A at 16.) He testified that he agrees with Nix that the 2002 sale and leaseback agreement is not indicative of current market rents. Sohm testified that he determined a range of rents from $2.88 to $3.96 per square foot based on four leases and one listing, ranging from May 2008 through January 2010. (Id. at 16-17.) He testified that he considered the percentage of office space of each property to be comparable. Sohm testified that he determined a rental rate of "$3.55 per square foot per year on triple net basis," or $1,859,305 per year, for the subject property. (Id. at 17.)
Sohm testified that he used a five percent vacancy rate because the tenant occupying the subject property is very stable and has continuously occupied the subject property since *Page 7 
construction. (See id.) Based on that rate, Sohm determined vacancy and credit loss in the amount of $92,965 for an effective gross income of $1,766,340. (Id. at 18.) Sohm testified that he determined operating expenses of $88,317 per year, including an allocation of three percent for management ($52,990) and an allocation of two percent per year for reserves ($35,327). (Id.) Sohm testified that he determined net operating income for the subject property in the amount of $1,678,023. (Id.)
Sohm testified that he considered a Korpacz national survey that indicated capitalization rates ranging from 5 to 9.5 percent for "investment grade warehouse properties" during the first quarter of 2009; the average rate is 7.13 percent. (See Def's Ex A at 18, 32.) Sohm noted that, currently, capitalization rates are higher, ranging from 7 to 12 percent with an average of 8.6 percent. (Id. at 18.) Sohm testified that he agrees with Plaintiff that a slightly higher capitalization rate is applicable to the subject property due to factors such as the age, size, and location of the subject property. However, he testified that the subject property would be attractive to potential buyers based on the tenant's strong national credit rating. Sohm selected a capitalization rate of 8.5 percent for the subject property. (Id.) Sohm noted that "no adjustment * * * for the effective property tax rate is required" because "rent is projected on a triple net basis." (Id.) Using an 8.5 percent capitalization rate, Sohm determined a rounded value of $19,741,000 under income approach. (Id.) Sohm placed greater weight on the income approach and determined a reconciled value of $19,741,000 for the subject property as of January 1, 2009. (Id. at 19.)
Nix testified that Plaintiff's requested 2009-10 real market value is "$10.5 million, $11 [million] tops." Defendant concluded a 2009-10 real market value of $19,741,000 for the subject *Page 8 
property based on Sohm's appraisal. (See Def's Ex A at 2.) Sohm stated at trial that a reduction to the real market value concluded by Defendant would not result in tax savings to Plaintiff.
 II. ANALYSIS
The issue before the court is the real market value of the subject property for the 2009-10 tax year. Real market value is defined as "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205.[2] The assessment date for the 2009-10 tax year was January 1, 2009. ORS 308.007; ORS 308.210. "When the determination of real market value * * * is an issue before the tax court, the court has jurisdiction to determine the real market value * * * on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.
There are three methods used to determine real market value: the cost approach, the income approach, and the sales comparison approach. Allen v. Dept. of Rev. (Allen),17 OTR 248, 252 (2003). All three approaches must be considered, although "it may be that all three approaches cannot be applied" for a particular property. OAR 150-308.205-(A)(2)(a). "[W]hether in any given assessment one approach should be used exclusive of the others or is preferable to another or to a combination of the approaches is a question of fact to be determined by the court upon the record."Pacific Power Light Co. v. Dept. of Rev.,286 Or 529, 533, 596 P2d 912 (1979). Both parties considered the income approach and the sales comparison approach to be relevant in this case. Defendant placed the most weight on the income approach because the subject property is an income-producing property, but found the sales comparison approach to be supportive. Plaintiff presented evidence relating to both the income and sales *Page 9 
comparison approaches; it was not clear if Plaintiff placed primary emphasis on one of the two approaches. Neither party relied on the cost approach.
Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." Feves v. Dept. of Revenue,4 OTR 302, 312 (1971). Plaintiff "must establish by competent evidence what the appropriate value of the property was as of the assessment date in question." Woods v. Dept. of Rev.,16 OTR 56, 59 (2002).
A. Income Approach
"The income method of valuation relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income stream it produces." Allen,17 OTR at 253 (citation omitted). "The direct capitalization method * * * focuses on two key components: (1) the capitalization rate * * * and (2) net operating income[.]" Id. at 253. The capitalization rate "is generally calculated using market sales. Slight deviations in cap[italization] rates profoundly change the estimated value of a property, making the proper calculation of the rate of paramount importance." Id. at 260.
Plaintiff did not provide a complete income approach; rather, Plaintiff provided opinions as to some of the components of an income approach as January 1, 2009, including the vacancy rate (7.5 percent), capitalization rate (11.5 percent), and market rent ($3.25 per square foot). Taken together, those figures do not comprise a complete analysis under the income approach. Furthermore, it is not clear to the court how Plaintiff determined those figures. Plaintiff provided some evidence concerning the capitalization rate, including two comparable sales. Plaintiff identified a sale in Woodland, California, on August 13, 2010; Sohm testified that that sale reflected a capitalization rate of about 9.4 percent. Plaintiff also identified a sale in Oregon *Page 10 
reflecting a capitalization rate of 9.5 percent; Plaintiff did not identify the sale date. Neither of those sales support Plaintiff's requested capitalization rate of 11.5 percent.
Defendant concluded a value of $19,741,000 under the income approach. Defendant relied on a Korpacz national survey indicating capitalization rates ranging from 5 to 9.5 percent for "investment grade warehouse properties" during the first quarter of 2009. The capitalization rates identified by Plaintiff, 9.4 and 9.5 percent, are both within the range of capitalization rates identified by the Korpacz survey. Defendant concluded a capitalization rate of 8.5 percent for the subject property, taking into account the age, size, and location of the subject property as well as the national credit rating of the tenant. The court finds Defendant's capitalization rate of 8.5 percent and Defendant's overall income approach analysis to be reasonable and well-supported. The court accepts Defendant's 2009-10 income approach value of $19,741,000.
B. Sales Comparison Approach "Under the sales comparison approach, the value of a property is derived by `comparing the subject property with similar properties, called comparable sales.' That comparison is based on many factors, and adjustments are made for any differences between the comparable sales and the subject property so that the appraiser can derive a value for the subject property."
Magno v. Dept. of Rev.,19 OTR 51, 58 (2006) (citations omitted); see also
OAR 150-308.205-(A)(2)(c) ("In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used"). Thus, "[t]he court looks for arm's-length sale transactions of property similar in size, quality, age and location * * * in order to determine the real market value" of the subject property.Richardson v. Clackamas County Assessor, TC-MD No 020869D, WL 21263620 at *3 (Mar 26, 2003). *Page 11 
Plaintiff identified three comparable sales in the West Coast region[3] : a property superior in age and quality to the subject property that was sold on August 13, 2010, in Woodland, California at $25.15 per square foot; two distribution warehouses in Oregon that sold for $13,100,000 total;[4] and an Ace Hardware Distribution Warehouse in Yakima, Washington, that is relatively close in size and age to the subject property and sold for $16.26 per square foot in March 2006 and $26.48 per square foot in April 2007. Plaintiff did not make adjustments for time, quality, age, location, or other differences between the comparables sales and the subject property.
Sohm determined a range of values from $38 to $46 per square foot based four sales of properties in Washington and Oregon in 2007, adjusted for size, age, quality, and location. Sohm referred to time trending from 2007 to January 1, 2009, during trial, but it is not clear to the court what time adjustments, if any, were applied to Sohm's comparable sales. The court finds Defendant's value of $38 per square foot, or $19,900,000, under the sales comparison approach to be reasonable based on the evidence presented, but affords little weight to the sales comparison approach given the date of the sales and lack of clear time adjustments. C. Reconciliation; Aggrievement underORS 305.275
For the reasons stated above, the court finds that little weight should be afforded to the sales comparison approach. Primary emphasis is placed on the income approach, under which the court finds the 2009-10 real market value of the subject property to be $19,741,000. At trial, Sohm testified that a reduction in the 2009-10 real market value of the subject property to *Page 12 
$19,741,000 would not result in tax saving to Plaintiff given that the 2009-10 maximum assessed and assessed values are both set at $14,176,035. (See Ptf's Compl at 2.)
ORS 305.275(1)(a) requires that a person appealing to the Magistrate Division of the Oregon Tax Court be "aggrieved." "In requiring that taxpayers be `aggrieved' under ORS 305.275, the legislature intended that the taxpayer have an immediate claim of wrong." Kaady v. Dept. of Rev., 15 OTR 124, 125 (2000). This court has consistently interpreted ORS 305.275(1) to require that a taxpayer's requested value result in tax savings to the taxpayer.See Parks Westsac L.L.C. v. Dept. of Rev.,15 OTR 50, 52 (1999). Reduction of Plaintiff's 2009-10 real market value to $19,741,000 would not result in tax savings to Plaintiff; thus, Plaintiff is not aggrieved within the meaning of ORS 305.275(1) and Plaintiff's appeal must be denied.
 III. CONCLUSION
After carefully considering the evidence and testimony presented, the court finds that Plaintiff did not prove its requested real market value of $10.5 million by a preponderance of the evidence. Defendant presented competent evidence that the 2009-10 real market value of the subject property was $19,741,000. However, a reduction in the 2009-10 real market value of the *Page 13 
subject property to $19,741,000 would not result in tax savings to Plaintiff and the court is without authority to order that reduction. Plaintiffs appeal must be denied. Now, therefore,
IT IS THE DECISION OF THIS COURT that Plaintiffs appeal is denied.
Dated this ____ day of September 2011.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor,1241 State Street, Salem, OR.
 Your Complaint must be submitted within 60 days after the dateof the Decision or this Decision becomes final and cannot bechanged.
 This document was signed by Magistrate Pro Tempore Allison R.Boomer on September 30, 2011. The Court filed and entered thisdocument on September 30, 2011.
[1] Sohm testified that Plaintiff's measurement of the subject property is 522,420 square feet.
[2] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to 2007.
[3] Sohm testified persuasively that warehouses in other parts of the country were more troubled than West Coast warehouses.
[4] Nix did not identify a price per square foot for the two warehouses in Oregon. *Page 1